**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| RINI EKA A. SOEGIYONO, Administrator of the Estate of ANDRI WIRANOFA, deceased, <br><br> Plaintiff, <br><br> v. <br><br> THE BOEING COMPANY, a corporation, <br><br> Defendant. | Case No. <br><br><br> **JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff RINI EKA A. SOEGIYONO ("Plaintiff"), Administrator of the Estate of ANDRI WIRANOFA, deceased ("Decedent"), alleges as follows for her Complaint against Defendant, THE BOEING COMPANY ("Boeing"):

**OVERVIEW**

1. On October 29, 2018, Lion Air Flight JT 610, a Boeing Model 737 MAX 8 aircraft, crashed into the Java Sea off the coast of the Republic of Indonesia. The crash killed all 189 persons on board, including Decedent.

2. Plaintiff is Decedent's loved one and representative. Plaintiff brings this action under the Illinois Wrongful Death Act, 740 ILCS 180/1 *et seq.*, to recover compensatory and punitive damages from Boeing, which caused the death of Decedent.

3. Specifically, Boeing defectively designed a new flight control system for the 737 MAX 8, which utilized a Maneuvering Characteristics Augmentation System ("MCAS") reliant on information from a single Angle of Attack ("AOA") sensor. Further, Boeing failed to warn,

notify, instruct, or train airlines, pilots, and other important parties of the existence of the MCAS as well as how to respond to and/or override the MCAS when necessary to safely control the aircraft. Boeing's design defects and failures to warn, notify, instruct, and train led to the subject crash.

4. Boeing's failures resulted from an emphasis on corporate profit over personal safety. On information and belief, Boeing made improper decisions, at the expense of safety, in developing the 737 MAX 8 in order to: (a) hasten regulatory approval of the model;[1] (b) limit required training of airline pilots on the new model; and (c) obtain important sales contracts from key airline customers.

5. Plaintiff seeks to recover for the grievous harm caused by Boeing's decision-making and to punish such corporate conduct in the hopes of preventing future tragedy.

## THE PARTIES

6. At all relevant times, the Decedent was an individual residing in Indonesia.

7. Plaintiff is a citizen of Indonesia and is the duly appointed personal representative of the estate of Decedent.

8. At all relevant times, Boeing was and is a corporation organized under the laws of Delaware with its worldwide headquarters and principal place of business in Chicago, Illinois.

## JURISDICTION AND VENUE

9. Original jurisdiction exists in the District Courts of the United States pursuant to

---

[1] Plaintiff plans to assert claims against the United States Federal Aviation Administration ("FAA") under the Federal Tort Claims Act, 28 U.S.C. § 2674, after exhausting her administrative remedies under 28 U.S.C. § 2675. Plaintiff believes that the FAA was negligent in its certification of the 737 MAX 8 in a number of ways, including but not limited to: (i) failing to require sufficient testing and data to support changes from the 737 series to the 737 MAX series of aircraft; (ii) delegating excessive authority to Boeing during the regulatory approval process; (iii) failing to require sufficient pilot training for the new model; (iv) failing to require flight manual updates for the model addressing the MCAS; and (v) failing to require Boeing to obtain a new type certificate for the 737 MAX 8 and instead allowing Boeing to obtain a common type rating with existing 737 models.

28 U.S.C. § 1369, commonly known as the Multiparty, Multiforum Trial Jurisdiction Act.

10. Venue exists in this District pursuant to 28 U.S.C. § 1391(b) as Defendant Boeing resides in this district. Further, a substantial part of the events or omissions giving rise to the claims occurred in this district, including key technical and financial decisions regarding the development and design of the 737 MAX 8, among other things.

## GENERAL ALLEGATIONS

**I.    The 737 MAX 8 is Widely Sold and Used in the United States**

11. The 737 MAX 8 is the newest and best-selling model of Boeing's 737 series of aircraft, with over three hundred 737 MAX 8's registered worldwide.

12. The 737 MAX 8 is extremely popular in the United States. U.S.-based airlines American Airlines and Southwest Airlines are two of the world's biggest users of the 737 MAX 8. United Airlines uses the 737 MAX 8 model as well. Miami International Airport has the highest number of 737 MAX 8 flight departures in the world. Further, Air Canada operates numerous flights into and out of the Unites States on the 737 MAX 8.

13. At all relevant times, Boeing manufactured the 737 MAX 8 model aircraft, including its component parts, in the United States.

14. At all relevant times, Boeing contracted with component part manufacturers in the United States, who supplied Boeing components for the 737 MAX 8.

15. The FAA approved the design of the 737 MAX 8 model aircraft.

16. At all relevant times, Boeing marketed, manufactured, produced, assembled, and sold the subject aircraft in the United States, including to American Airlines, Southwest Airlines, and United Airlines.

**II.     Boeing Designed the 737 MAX 8 Because of Cost, Competition and Time Concerns**

17.     In Spring of 2011, Boeing learned that its long-time customer, American Airlines, was considering whether to place a large order of commercial airplanes with Airbus. Airbus, a foreign competitor of Boeing's, was and is the manufacturer of the comparatively fuel-efficient A320 model aircraft. If Boeing wanted to compete with Airbus on the American Airlines contract, it needed to act quickly.

18.     Boeing decided thereafter that, rather than develop an entirely new design to replace the 737 series, it would update the 737 instead with the 737 MAX model aircraft. The decision saved Boeing years on development time and cost and enabled it to compete for American Airlines' business. A former senior Boeing official confirmed that Boeing decided to update the 737, instead of developing a new model, because it would be far quicker, easier, and cheaper to do so.

19.     Updating the 737 model would also ensure faster regulatory approval from the FAA. Moreover, since pilots had been flying the 737 series for years, it would limit the necessity of additional pilot training which, in turn, would diminish the cost to airline customers. Rich Ludtke, a former Boeing engineer who helped design the 737 MAX, said that the company instructed engineers to design the MAX so as to avert a requirement of pilot training. According to Mr. Ludtke, such a directive "was a first" in his 19-year tenure at Boeing.

20.     Boeing was also under pressure to compete with the fuel-efficiency of the larger engine on the Airbus A320. Accordingly, Boeing implemented a larger and more powerful engine in the MAX than it had in previous 737s. Because of its size, Boeing positioned the engine further forward on the wing of the MAX to provide more ground clearance.

21.     The size and positioning of the engine had significant consequences. In particular,

it altered the aerodynamics of the plane, making it more likely to pitch-up during flight.

22. If the nose of the plane pitches upward at too extreme an angle, the plane can stall and ultimately crash.

### III. Boeing Implements MCAS to Address the MAX's Tendency to Pitch-Up

23. To address the MAX's tendency to pitch upward, Boeing added new software to the model, called the Maneuvering Characteristics Augmentation System or "MCAS."

24. MCAS was designed to automatically push the nose of the plane down if the plane's Angle of Attack ("AOA") sensor interpreted the plane's nose pitched-up at a dangerous angle. An AOA sensor measures the angle between airflow and the wing of the plane.

25. While Boeing included two AOA sensors on the MAX (one on each side of the plane), MCAS relied on data from just one of the sensors to initiate. As such, if the relevant AOA sensor transmitted incorrect information, MCAS could unnecessarily push the nose of the plane down, resulting in a nosedive.

26. The image below illustrates the operation of MCAS in the 737 MAX 8:

Case: 1:19-cv-05311 Document #: 1 Filed: 08/06/19 Page 6 of 19 PageID #:6




### III. Boeing Disregarded Pilots in Designing MCAS

27. The design of the MCAS made it susceptible to working at cross-purposes with pilots.

28. Specifically, when the nose of an airplane improperly tilts downward, a pilot's natural reaction is to pull back on the control column (or "yoke") to raise the nose. Whereas in prior 737 models such a reaction would work by triggering "breakout switches that stop any automatic tail movement tending to move the nose of the plane down," such a reaction does not work to counteract the MCAS in the MAX. The MCAS assumes that the yoke is already pulled back in the extreme and prevents further pullback at odds with MCAS' function.

29. Despite incorporating this new automatic system with the potential to work against natural and appropriate pilot behavior when compared with prior models, Boeing did not inform pilots of the MCAS.

30. Boeing did not include information regarding the MCAS in the flight operations manual. Moreover, pilots were not trained on the MCAS. Training merely consisted of a one-hour session on an iPad without any simulators specific to the MAX model. In short, as stated by Jon Weaks, president of the Southwest Airlines Pilots Association, pilots "were kept in the dark" on the MAX's new flight control system.

31. On information and belief, Boeing's non-disclosure of MCAS was part of an effort to downplay the significance of the new system so that regulatory approval could be obtained quickly and without the need for additional pilot training.

IV.     **The FAA Enabled Boeing's Failures**

    A.     **Overview of the FAA's Safety Review**

32. The FAA has regulatory authority in the U.S. over the approval of aircraft design.

33. As a part of the regulatory approval process, the FAA may delegate portions of aircraft systems review to the entity seeking approval, such as Boeing. However, the FAA has over the years delegated increasing authority to Boeing to handle more of the work necessary to certifying the safety of Boeing airplanes.

34. A portion of the FAA's regulatory approval process addresses "System Safety." As defined by the FAA:

> System safety is a specialty within system engineering that supports program risk management. It is the application of engineering and management principles, criteria and techniques to optimize safety. The goal of System Safety is to optimize safety by the identification of safety related risks, eliminating or controlling them by design and/or procedures, based on acceptable system safety precedence….

35. FAA Order 8040.4 establishes a five-step approach to safety risk management, including Planning, Hazard Identification, Analysis, Assessment, and Decision.

36. With respect to "Hazard" analysis in particular, the FAA requires that both hazard

7

severity and the likelihood of occurrence of the hazard be identified. The guiding principle for the FAA is that the more severe the consequences, the lower the probability of occurrence required to be deemed acceptable.

37. Hazard severity is separated into a number of categories in order of most to least severe, including: Catastrophic, Hazardous, Major, Minor, and No Safety Effect. The most severe category of accident—Catastrophic—"results in multiple fatalities and/or loss of the system." The next accident category—Hazardous—results in less severe but nonetheless grave consequences, such as "[s]erious or fatal injury to small number of occupants of aircraft (except operators)."

**B.    The FAA Improperly Delegated Safety Analysis to Boeing**

38. With respect to the 737 MAX 8, FAA managers pushed FAA engineers to delegate safety analyses to Boeing itself and to quickly approve Boeing's safety assessments in the quest for Boeing to catch Airbus and certify the MAX.

39. To that end, the FAA specifically delegated the Systems Safety Analysis of the MCAS to Boeing for the 737 MAX 8.

40. Evidence indicates that Boeing's Systems Safety Analysis submitted to the FAA in conjunction with certifying the 737 MAX 8 was flawed in several manners, including that Boeing: (a) understated the power of the MCAS, which is capable of moving the tail of the plane more than four times farther than was stated in the initial safety analysis document submitted, i.e., 0.6 degrees in the submission as compared to a post-crash disclosure of 2.5 degrees; (b) failed to account for how MCAS could reset itself each time a pilot responded, thereby missing the potential impact of the system repeatedly pushing the plane's nose downward; and (c) assessed a failure of the system as "Hazardous," not "Catastrophic" (which should nonetheless, however, have precluded activation of MCAS based on input from a single AOA sensor).

41. The confluence of circumstances described above led to the tragedy of Lion Air Flight JT 610.

## V. Lion Air Flight JT 610 Crashed on October 29, 2018

42. In approximately August 2018, Boeing delivered a newly manufactured 737 MAX 8 aircraft with tail number "PK-LQP" to Lion Air in Indonesia (the "subject aircraft"), knowing that such aircraft would be used by Lion Air for commercial flight operations, including scheduled passenger flights.

43. Prior to October 29, 2018, Boeing designed, manufactured, assembled, and sold the subject aircraft and prepared, published, and provided to Lion Air information including, but not limited to, a 737 MAX 8 flight operations manual ("FOM") regarding the operation of the subject aircraft.

44. On October 29, 2018, Decedent was a passenger on board the subject aircraft operated by Lion Air as Flight JT 610. The flight was scheduled to depart from Jakarta to Pangkal Pinang, a provincial capital of a small island in the Java Sea.

45. On the morning of October 29, 2018, the subject aircraft departed from Jakarta's Soekarno – Hatta International Airport at or around 6:21 a.m.

46. Shortly after takeoff, the crew contacted air traffic controllers and requested a return to Jakarta.

47. The subject aircraft received authorization to return, but it did not manage a turnaround.

48. The subject aircraft's AOA sensor provided incorrect data to the flight computer, triggering MCAS and repeatedly and unnecessarily pushing the nose of the plane down. In fact, tracking data indicates that the aircraft pitched up and down like a roller coaster during the 12-

minute flight before the plane nose-dived into the Java Sea. Such data indicates that the pilots struggled repeatedly to counteract MCAS without success. Indeed, witnesses saw the subject aircraft banking left, making significant altitude shifts, and then dropping sharply.

49. According to data from flight radars, the plane was at an altitude of about 5,000 feet when its final descent began. The subject aircraft plummeted into the sea and disintegrated upon impact. The crew and passengers, including Decedent, would have suffered unspeakable horror, pain, terror and injury as they plummeted to their deaths.

50. Tragically, during the final minutes of the flight, the captain of the subject aircraft reviewed a technical manual trying in vain to determine what was happening to the plane and why his attempts to counteract the downward tilt of the plane's nose repeatedly failed.

51. Evidence shows that the Lion Air pilot had no chance. During post-crash flight simulations recreating issues experienced on the aircraft, pilots discovered that they had less than 40 seconds to override MCAS and avert a crash.

52. At the time the subject aircraft and its FOM left the custody and control of Boeing, they were defective and unreasonably dangerous in one or more of the following respects, among other defects:

   a. The subject aircraft's defective MCAS caused the aircraft's nose to suddenly, without warning, drop and dive steeply, and said event could occur even while under manual control when a pilot would not reasonably expect a flight computer to override one's actions;

   b. The scenario described in subsection (a) above was not covered in the defective FOM, and Defendant Boeing did not disclose the foregoing or how to recover the plane from the foregoing to Lion Air pilots when Lion Air purchased the subject aircraft;

   c. The subject aircraft received "erroneous input" from one of its defective AOA sensors;

   d. The scenario described in (c) above was not covered in the defective FOM, and

        Defendant Boeing did not disclose how to recover the plane from the foregoing to Lion Air pilots when Lion Air purchased the subject aircraft;

    e. The subject aircraft and FOM lacked proper and adequate instructions and warnings regarding the design and functions of its MCAS system; and

    f. The subject aircraft and FOM lacked proper and adequate instructions and warnings regarding how to correct a malfunctioning MCAS system.

53. As a direct and proximate result of one or more of the above-described defective and dangerous conditions in the subject aircraft which caused it to crash into the sea as described above, Decedent's heirs, including minor children, have suffered and will continue to suffer injuries in the form of unspeakable pain, suffering, loss of companionship, and loss of earnings and support, among other damages.

## VI. The FAA and Boeing Issue Directives on MCAS after the Lion Air Crash

54. Boeing's actions subsequent to the crash show that it failed Lion Air and its passengers with respect to the design of the aircraft as well as the information it provided regarding aircraft.

55. On November 6, 2018, Boeing issued Flight Crew Operations Manual Bulletin No. TBC-19 regarding "Uncommanded Nose Down Stabilizer Trim Due to Erroneous Angle of Attack (AOA) During Manual Flight Only." Therein, for the first time, Boeing explained that a problem could arise on MAX airplanes due to erroneous AOA readings. Boeing further disclosed that pilots would be unable to counteract automatic pushing of the plane's nose downward "unless the stabilizer trim system is deactivated through the use of both STAB TRIM CUTOUT switches[.]"

56. On November 7, 2018, the FAA sent an emergency directive to all MAX 8 operators which detailed that pilots can stop a malfunctioning MCAS by merely pressing two buttons. The bulletin further details: "This condition, if not addressed, could cause the flight crew to have difficulty controlling the airplane, and lead to excessive nose-down attitude, significant

altitude loss, and possible impact with terrain."

57. On November 10, 2018, Boeing sent correspondence to all 737NG/MAX customers, among others, identifying MCAS and explaining its function. Boeing confirmed therein that MCAS was new to 737 MAX models.

58. After Boeing issued its warning bulletin, Capt. Mike Michaelis, chairman of the safety committee of the Allied Pilots Association at American Airlines, told pilots: "This is the first description [of the MCAS] you, as 737 pilots, have seen . . . It is not in the American Airlines Flight Manual . . . nor is there a description in the Boeing FCOM (Flight Crew Operation Manual)."

59. The new information prompted one pilot to exclaim in an online chat forum:

> We had no idea that this MCAS even existed. It was not mentioned in our manuals anywhere (until today). Everyone on the 737 had to go through differences training for the MAX and it was never mentioned there either . . . I've been flying the MAX-8 a couple times per month for almost a year now, and I'm sitting here thinking, what the hell else don't I know about this thing?

**VII.    Another 737 MAX 8 Crashes and the FAA Grounds the Aircraft in the U.S.**

60. On March 10, 2019, another commercial flight involving the Boeing 737 Max 8, Ethiopian Airlines Flight 302, crashed shortly after takeoff.

61. On March 13, 2019, the FAA grounded all Boeing 737 MAX aircraft in the U.S.

62. Investigation has shown that both the Lion Air and Ethiopian Airlines flights experienced similar fluctuations in altitude before crashing, as illustrated below:



### VIII. Boeing Recognizes the Problems with the MAX's Flight Control System and Announces a "Software Update" to Correct It

63. Boeing has now recognized the defects in the MAX's flight control system which caused the Lion Air crash.

64. Boeing has now claimed that it has "developed an MCAS software update to provide additional layers of protection if the AOA sensors provide erroneous data." Boeing has further claimed that the flight control system "will now compare inputs from both AOA sensors" and that the "MCAS can never command more stabilizer input than can be counteracted by the flight crew pulling back on the column."

65. On April 4, 2019, Boeing CEO Dennis Muilenburg apologized for the death of passengers in both the Lion Air and Ethiopian Airlines flights. In his apology, Mr. Muilenburg admitted that "it's apparent that in both flights the Maneuvering Characteristics Augmentation System . . . activated in response to erroneous angle of attack information."

13

66. As of today, all known Boeing 737 MAX airplanes remain grounded.

## COUNT I
## STRICT PRODUCTS LIABILITY
### (Pursuant to the Illinois Wrongful Death Act, 740 ILCS 1801, et seq.)

67. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

68. At all relevant times, Boeing did design, manufacture, assemble, inspect, repair, endorse, draft, test, franchise, market, promote, advertise, supply, lease, distribute, and place into the stream of commerce the subject aircraft and FOM.

69. At the time the subject aircraft and FOM left the hands of Boeing, the subject aircraft, FOM, and the components alleged above, were defective and unsafe in manufacture, design, and warnings.

70. On or about October 29, 2018, Lion Air and its officers, directors, employees, and/or agents and Decedent were using the subject aircraft and FOM in a reasonable and foreseeable manner. Lion Air and its officers, directors, employees, and/or agents and the Decedent were unaware that said products were unsafe for their intended use. The defective and unsafe conditions of aforesaid products caused the subject aircraft to plummet into an uncontrollable nosedive and crash into the sea. The Decedent was killed as a direct and legal result of the defective and unsafe conditions of said products and the component parts thereof.

71. Boeing knew or should have known of the defects in the design and manufacture of the aforesaid products, which constitutes a hazard for those coming into contact with the aforesaid products and the component parts, and Defendant Boeing failed to notify, warn, and protect those coming into contact with the aforesaid products, and such failure to warn was one of the legal causes of the incident and death of Decedent.

72. The aforesaid products failed to perform as safely as an ordinary consumer would have expected when the subject aircraft plummeted into an uncontrollable nose dive and crashed into the sea.

73. As a direct and legal result of the acts and omissions of Boeing, Decedent's heirs have been deprived of the love, care, society, comfort, assistance, protection, affection, companionship, guidance, solace, services, and support of said Decedent, and have thereby sustained, and will continue to sustain, pecuniary loss in a sum as yet unascertained.

**WHEREFORE**, Plaintiff requests that this Court grant judgment in their favor and against Defendant on Count I and award Plaintiff the following relief:

(1) Award Plaintiff all compensatory damages available under the law in an amount to be determined at trial;

(2) Award Plaintiff punitive damages in an amount to be determined at trial;

(3) Award Plaintiff interest in an amount to be determined by the Court;

(4) Award Plaintiff court costs in an amount to be determined by the Court; and

(5) Grant such other relief as this Court deems appropriate and just.

## COUNT II
### NEGLIGENT PRODUCTS LIABILITY
**(Pursuant to the Illinois Wrongful Death Act, 740 ILCS 180/1, et seq.)**

74. Plaintiff realleges and incorporates by reference paragraphs 1-66 as though fully set forth herein.

75. At all times herein mentioned, Boeing so negligently, carelessly, recklessly, and with gross negligence, designed, manufactured, assembled, inspected, repaired, maintained, endorsed, drafted, tested, franchised, supplied, sold, leased, distributed, and placed into the stream of commerce the subject aircraft and FOM, and negligently failed to warn, relative to the said products and the components alleged above, and otherwise so negligently conducted itself, so as

15

to directly and legally cause the injuries and damages described herein to Plaintiff.

76. At all times herein mentioned, Defendant Boeing knew, or in the exercise of reasonable care should have known, that the subject aircraft, the FOM and the components alleged above, were defectively and negligently manufactured, designed, assembled, tested, inspected, fabricated, constructed, distributed, marketed, and sold. Defendant Boeing failed to take reasonable steps to avoid exposing consumers, including Decedent, to the dangerous condition of such products, failed to disclose the products' known defects, failed to warn, failed to recall, failed to provide or send subsequent warnings after distribution to consumers, failed to warn Lion Air of the MCAS system, and otherwise so negligently conducted itself, so as to directly and legally cause the injuries and damages described herein to Decedent's heirs, including minor children.

77. On or about October 29, 2018, Lion Air and its officers, directors, employees, and/or agents and Decedent were using the subject aircraft and FOM in a reasonable and foreseeable manner. Lion Air and its officers, directors, employees, and/or agents and Decedent were unaware that said products were unsafe for their intended use. The defective and unsafe conditions of the foregoing products caused the subject aircraft to fall into an uncontrollable nosedive and crash into the sea. The Decedent was killed as a result of the defective nature of the subject aircraft and FOM.

78. Boeing had a duty, as a designer and manufacturer of goods, to manufacture, design, inspect and test the subject aircraft and FOM to ensure they were safe for use by ordinary consumers.

79. From the time the subject aircraft and FOM were delivered to Lion Air to the time of the crash, the aforesaid products were only used for their intended purpose and were not modified, upgraded, altered, damaged, or substantially changed in any way.

80. As a direct and legal result of the acts and omissions of Defendant Boeing, Decedent's heirs have been deprived of the love, care, society, comfort, assistance, protection, affection, companionship, guidance, solace, services, and support of said Decedent, and have thereby sustained, and will continue to sustain pecuniary loss in a sum as yet unascertained.

**WHEREFORE**, Plaintiff requests that this Court grant judgment in their favor and against Defendant on Count II and award Plaintiff the following relief:

(1) Award Plaintiff all compensatory damages available under the law in an amount to be determined at trial;

(2) Award Plaintiff punitive damages in an amount to be determined at trial;

(3) Award Plaintiff interest in an amount to be determined by the Court;

(4) Award Plaintiff court costs in an amount to be determined by the Court; and

(5) Grant such other relief as this Court deems appropriate and just.

## COUNT III
## CIVIL CONSPIRACY
**(Pursuant to the Illinois Wrongful Death Act, 740 ILCS 180/1, et seq.)**

81. Plaintiff realleges and incorporates by reference paragraphs 1-66 as though fully set forth herein.

82. Boeing conspired with and/or agreed to participate in a scheme, plan, and/or device with the FAA and/or agents of the FAA to hastily certify the 737 MAX 8 in violation of U.S. law, in a quest to best a foreign company, Airbus, in the sale of comparable aircrafts.

83. Boeing and the FAA and its agents knowingly participated in this conspiracy by concealing, omitting, ignoring, and/or downplaying the safety issues with the 737 MAX 8 aircraft and its flight control system. Such conspiracy was accomplished through the FAA's improper delegation of safety assessments to Boeing and, in turn, Boeing's submission of incomplete and incorrect assessments to the FAA, specifically with respect to the MCAS.

17

84. Boeing committed overt tortious and/or unlawful actions in furtherance of this conspiracy by: (a) failing to adhere to industry standards and regulations in designing the MAX; (b) improperly classifying safety hazards relating to the MAX, including its flight control system; (c) failing to recuse itself from the certification process when it knew it was acting with the sole, or primary, purpose of certifying the MAX quickly so as to compete with Airbus; and (d) pressuring Boeing personnel to design the MAX, and assess such design, in order to obtain quick certification and not for the safety of pilots and passengers.

85. As a result, Boeing produced, and the FAA certified, a defective passenger aircraft which caused the death of hundreds of persons, including Decedent.

86. Plaintiff was therefore injured and sustained damages as a direct and proximate result of Boeing's actions as part of the conspiracy.

**WHEREFORE**, Plaintiff requests that this Court grant judgment in their favor and against Defendant on Count III and award Plaintiff the following relief:

(1) Award Plaintiff all compensatory damages available under the law in an amount to be determined at trial;

(2) Award Plaintiff punitive damages in an amount to be determined at trial;

(3) Award Plaintiff interest in an amount to be determined by the Court;

(4) Award Plaintiff court costs in an amount to be determined by the Court; and

(5) Grant such other relief as this Court deems appropriate and just.

Dated: August 6, 2019                              HART MCLAUGHLIN & ELDRIDGE, LLC

                                                   By: /s/ Steven A. Hart
                                                   Steven A. Hart

Steven A. Hart
John S. Marrese
Jonathan O. Emmanuel

18

HART MCLAUGHLIN & ELDRIDGE, LLC
22 West Washington Street
Suite 1600
Chicago, IL 60602
Phone: (312) 955-0545
Fax: (312) 971-9243
shart@hmelegal.com
jmarrese@hmelegal.com
jemmanuel@hmelegal.com

Dated: August 6, 2019                                KABATECK LLP


                                                     By: /s/ Brian S. Kabateck
                                                     Brian S. Kabateck (*pro hac vice*)

Brian S. Kabateck (*pro hac vice*)
Christopher B. Noyes (*pro hac vice*)
KABATECK LLP
633 West 5th Street, Suite 3200
Los Angeles, California 90071
Phone: (213) 217-5000
Fax: (213) 217-5010
bsk@kbklawyers.com
cn@kbklawyers.com

Dated: August 6, 2019                                SANJIV N. SINGH, APLC


                                                     By: /s/ Sanjiv N. Singh
                                                     Sanjiv N. Singh (*pro hac vice*)

Sanjiv N. Singh (*pro hac vice*)
SANJIV N. SINGH, APLC
1650 South Amphlett Blvd. Suite 220
San Mateo CA 94402
Phone: (650) 389-2255
Fax: (415) 358-4006
ssingh@sanjivnsingh.com
*Counsel for Plaintiff*